IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 6, 2004

**STATE OF TENNESSEE v. RICKY GROVER AARON**

**Appeal from the Criminal Court for Davidson County**
**No. 99-D-2360 Walter Kurtz, Judge**

————————

**No. M2002-02288-CCA-R3-CD -Filed July 8, 2004**

————————

On October 28, 1999, the defendant, Ricky Grover Aaron, was indicted by the Davidson County Grand Jury for especially aggravated sexual exploitation of a minor and especially aggravated kidnapping. Following a jury trial in June of 2001, the defendant was convicted of especially aggravated sexual exploitation of a minor and false imprisonment. The trial court sentenced the defendant to eleven years for especially aggravated sexual exploitation of a minor and eleven months, twenty-nine days for false imprisonment. The sentences were to run concurrently to each other and consecutively to a federal sentence the defendant was serving at the time of trial. The defendant argues eight issues on appeal:(1) whether the trial court erred in denying the defendant's motion to dismiss due to unnecessary delay; (2) whether the trial court erred in denying the defendant's pretrial motion to suppress his alleged admissions to police because the defendant was subjected to custodial interrogation without having been given Miranda warnings; (3) whether the trial court erred in denying the defendant's motion to suppress a handgun seized by police from his vehicle; (4) whether the evidence in the record is sufficient to support a finding by a rational trier of fact that the defendant is guilty beyond a reasonable doubt of especially aggravated sexual exploitation of a minor and false imprisonment; (5) whether the trial court erred in admitting alleged hearsay testimony related to the alleged victim's mother's response to her daughter's characterization of the defendant as a "pervert"; (6) whether the trial court erred in admitting evidence that another person had been convicted of a sexual offense involving the alleged victim in an unrelated case; (7) whether the trial court erred in failing to declare a mistrial when the prosecutor, in direct violation of the trial court's pretrial ruling, elicited testimony from a police detective that the defendant admitted having child pornography on his computer; and (8) whether the trial court erred in imposing an excessive sentence for the defendant's conviction for especially aggravated sexual exploitation of a minor, and did the court further err in ordering that the sentences in this case be served consecutively to the defendant's federal sentence. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID G. HAYES, and THOMAS T. WOODALL, JJ., joined.

Jeffrey DeVasher, Assistant Public Defender, Nashville, Tennessee, for the appellant, Ricky Grover Aaron.

Paul G. Summers, Attorney General & Reporter; Kim R. Helper, Assistant Attorney General; Victor S. Johnson , District Attorney General; Brian Holmgren and Lisa Naylor, Assistant Districts Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

The defendant caught the fourteen-year-old, H.F.[1], shoplifting in the pharmacy where he was the assistant manager. The defendant met with the victim and her mother and agreed to drop any criminal charges if the victim would agree to do some work around the pharmacy for him. The victim visited the pharmacy several times pursuant to this agreement. On one occasion, the defendant called H.F. over to his car and showed her pornographic pictures of young children. On another occasion he brought H.F. into the manager's office and locked the door. He asked the victim whether she had ever had sex with an older man and bragged that he had had sex with a fifteen-year-old girl. He made several sexual comments and began to rub the victim's legs. He then brought out a gun and told H.F. she could not leave until he took some photographs. He removed her clothing and took a picture of her in her underwear. The defendant offered the victim some blue and pink pills which she refused. He then told her to remove her underwear and took another picture with her breasts and genitals exposed. He then threatened to kill her or prosecute her for shoplifting if she told anyone. H.F. did not return to the pharmacy and did not tell anyone about the pictures at that time. Later, she told her mother about the pictures while hospitalized at the Vanderbilt Psychiatric Hospital. She then spoke with the police at Vanderbilt.

Detective Jeffrey Goodwin of the Davidson County Metropolitan Police went to the defendant's home where the defendant lived with his girlfriend, Brandy Mayes. Ms. Mayes actually owned the home in question. Detective Goodwin followed Ms. Mayes to Hickory Hollow Mall where he told her that he suspected the defendant of possessing child pornography and asked for permission to search their home when the defendant was not present. Ms. Mayes came up with a plan to get the defendant out of the house and consented in writing to the search. The defendant came home during the search and Detective Goodwin spoke with him. This discussion led to the defendant admitting that he showed pornographic photographs to the victim and that he also took some photographs of the victim. The defendant also mentioned he might have some photographs in his truck. This statement led to a search of his truck where Detective Goodwin found a gun. At some point while searching the house, the police also found pornographic images of children on the defendant's computer.

---

[1] It is the policy of this Court to refer to alleged victims of sexual abuse by their initials.

The defendant was arrested on federal charges in June of 1999 based on the pornographic images found on his computer. He was released on bail pending trial. On October 28, 1999, the defendant was indicted by the Davidson County Grand Jury for one count of especially aggravated sexual exploitation of a minor and one count of especially aggravated kidnapping. On November 5, 1999, he was taken back into federal custody. The defendant remained at the Davidson County Criminal Justice Complex until September of 2000, even though he was in federal custody. In January of 2001, while in federal prison in another state, the defendant became personally aware that there was a state detainer on him placed in Davidson County. At that time, he declined the opportunity to force Davidson County authorities to bring him to trial in Tennessee. In January of 2002, the defendant finally filed the appropriate papers to begin prosecution of his case.

Following a jury trial, in June of 2002, the defendant was convicted for especially aggravated exploitation of a minor and false imprisonment. The trial court sentenced the defendant on July 8, 2002 to eleven years for the especially aggravated exploitation of a minor, to run consecutive to his federal sentence and a concurrent sentence of eleven months, twenty-nine days for his false imprisonment conviction. The trial court denied the defendant's motion for a new trial on August 9, 2002. Defendant filed his notice of appeal on September 5, 2002.

## ISSUES

The defendant argues eight issues on appeal: (1) whether the trial court erred in denying the defendant's motion to dismiss due to unnecessary delay; (2) whether the trial court erred in denying the defendant's pretrial motion to suppress his alleged admissions to police because the defendant was subjected to custodial interrogation without having been advised of is Miranda warnings; (3) whether the trial court erred in denying the defendant's motion to suppress a handgun seized by police from his vehicle; (4) whether the evidence in the record is sufficient to support a finding by a rational trier of fact that the defendant is guilty beyond a reasonable doubt of especially aggravated sexual exploitation of a minor and false imprisonment; (5) whether the trial court erred in admitting hearsay testimony related to the alleged victim's mother's response to her daughter's characterization of the defendant as a "pervert"; (6) whether the trial court erred in admitting evidence that another person had been convicted of a sexual offense involving the alleged victim in an unrelated case; (7) whether the trial court erred in failing to declare a mistrial when the prosecutor, in direct violation of the trial court's pretrial ruling, elicited testimony from a police detective that the defendant admitted having child pornography on his computer; and (8) whether the trial court erred in imposing an excessive sentence on the defendant's conviction for especially aggravated sexual exploitation of a minor, and did the court further err in ordering that the sentences in this case be served consecutively to the defendant's federal sentence.

# ANALYSIS

## Speedy Trial

The defendant's first argument is that he was deprived of due process of law under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, § 8 of the Tennessee Constitution due to the delay in bringing him to trial. The defendant argues that his right to a speedy trial was denied because the offenses were alleged to have occurred between January 1, 1998 and June 24, 1998, and commencement of the prosecution of the case did not begin until March 21, 2002. He argues that there was actual prejudice as a result of the delay because: (1) he was unable to get the names and addresses of the employees at the pharmacy where he was the manager; (2) federal agents had destroyed his computer and its contents during the delay; (3) the building where the offenses were committed had been destroyed and replaced; (4) and he lost the opportunity to serve his sentence concurrently with his federal sentence. The defendant also argues that the State caused the delay to gain tactical advantage.

The United States and Tennessee Constitutions guarantee the criminal defendant the right to a speedy trial. U.S. Const. amend VI; Tenn. Const. art. I, § 9; State v. Utley, 956 S.W.2d 489, 492 (Tenn.1997). The right to a speedy trial is also statutory in Tennessee. See Tenn. Code Ann. § 40-14-101. In addition, the Tennessee Rules of Criminal Procedure provide for the dismissal of an indictment, presentment, information or criminal complaint "[i]f there is unnecessary delay in presenting the charge to a grand jury against a defendant who has been held to answer to the trial court, or if there is unnecessary delay in bringing a defendant to trial...." Tenn. R. Crim. P. 48(b). The Tennessee Supreme Court has stated that "formal grand jury action or the actual restraints of an arrest are required" to trigger speedy trial analysis. Utley, 956 S.W.2d at 493. This is because "it is at this stage of arrest and grand jury action that the significant interests served by the right to a speedy trial are most directly implicated: the protection against oppressive pre-trial incarceration and the reduction of anxiety and concern caused by unresolved charges." Id.

When an accused seeks the dismissal of charges based upon the denial of the constitutional right to a speedy trial, the accused must establish a period of delay that is "presumptively prejudicial." State v. Jefferson, 938 S.W.2d 1, 12 (Tenn. Crim. App.1996) (citing Doggett v. United States, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L. Ed.2d 520 (1992); Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L. Ed.2d 101 (1972)). The length of the delay is dependent upon the peculiar circumstances of each case, and the delay that can be tolerated for "an ordinary street crime" is generally much less than for a serious, complex felony charge. Barker, 407 U.S. at 530-31. A delay of one year or longer marks the point at which courts deem the delay unreasonable enough to trigger further inquiry. Doggett, 505 U.S. at 652 n. 1; Utley, 956 S.W.2d at 494. If this threshold is crossed, a balancing test determines the merits of the speedy trial issue. In State v. Bishop, 493 S.W.2d 81, 83- 85 (Tenn.1973), the Tennessee Supreme Court recognized and adopted the balancing test the United States Supreme Court set forth in Barker in which four factors must be balanced. The factors are: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of the right

to speedy trial; and (4) the prejudice resulting from the delay. Barker, 407 U.S. at 530-32; Bishop, 493 S.W.2d at 83-84.

This court also recognizes that findings of fact by the trial judge are presumed correct and may only be overcome by a preponderance of the evidence contrary to that finding. Tenn. R. App. P. 13(d). The Tennessee Supreme Court has held that "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn.1996). The party prevailing at the trial court level is entitled to the "strongest legitimate view of the evidence" as well as "all reasonable and legitimate inferences that may be drawn from that evidence." Id.

The trial court stated the following findings from the bench:

> First of all, the first Barker versus Wingo factor is lengthened due to delay, and certainly the delay here of forty-four months is sufficient to support a speedy trial analysis. The reason for the delay is the next factor I'm supposed to look at, and that then is divided into four subcategories. Intentional delay to gain a tactical advantage or to harass the defendant, that is not present here. There's no indication of intentional delay to gain a tactical advantage or to harass the defendant.
>
> Two, bureaucratic indifference or negligence, I think that is present here. Certainly, when he was in custody in late '99 and in most of 2000, he was available to be served by this capias. It wasn't done. As near as I can figure out, it was just negligence that it wasn't done. And that certainly is a factor in favor of the defendant.
>
> The other reason for delay then was that the State simply didn't exercise its right under the interstate compact after January of 2001 but allowed the defense - - defendant to be put on notice and for him to act. I suppose that does weigh somewhat in favor of the defense.
>
> The assertion of the right - - well, it's a little confusing. According to the defendant's testimony he hired Mr. Ray, but Mr. Ray couldn't find the charge so he sort of let that go. When he was formally notified of the charge in 2001, he specifically declined to assert it and finally asserted it in January of 2002. The other thing is under the assertion of the right, but I presume this also leaks over into the prejudice side, he was in custody of the federal government. So this isn't like an occasion of a pretrial detainee or a person on bond waiting trial. Since the fall of '99, he's been in federal custody.
>
> But the most important factor by far is prejudice. In evaluating this factor the Court must be aware of the speedy trial right and its design to prevent undue and impressive incarceration prior to trial, that's not been the case here. The incarceration has been pursuant to the federal first pretrial incarceration and then his incarceration pursuant to federal conviction.

To minimize anxiety and concern accompanied [sic] public accusation, and there's no proof that that exists here especially in the light of the federal charges that were pending and then for which he became convicted of.

And then to limit the possibilities of long delay will impair the defense. Now, he made this argument that there's missing witnesses out there. But this is pretty nebulous, and I can't really put my finger on anything that would - - any witness that might be helpful nor has he specifically suggested what any witness would do to help him other than he told us about a conversation he had with a fellow employee. But it sounded to me like that entire conversation would be inadmissible at least certainly by the defense. As to what admissions he made to a fellow employee wouldn't ordinarily be admissible under 803(1.2), I guess what some people call a self-serving declarations, but they're not really self-serving declarations but are sometimes thought to fall under that rule of evidence.

And the other thing is a loss of concurrent time which really wasn't very - - it did not impress the Tennessee Supreme Court in State versus Simmons. And he still hasn't entirely lost his opportunity for concurrent time. This is not an insubstantial claim of denial of a speedy trial. But I think taking all the Barker versus Wingo factors into consideration especially considering the lack of proven prejudice, the fact that he's been in federal custody since the fall of '99, that while a close call balance come out in favor of the State here, the motion to dismiss for lack of a speedy trial is respectfully overruled.

Now we turn to our analysis using the Barker factors, keeping in mind that the factual findings of the trial court are presumed correct.

(1) The Length of the Delay

As noted above, a delay of one year or longer "marks the point at which courts deem the delay unreasonable enough to trigger the Barker inquiry." Doggett, 505 U.S. at 652 n. 1; see also Utley, 956 S.W.2d at 494. The delay in this case was over one year and, therefore, meets the threshold for consideration of the other factors.

(2) The Reason for the Delay

Reasons for the delay of prosecution fall within four categories: (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in by the defense. State v. Wood, 924 S.W.2d 342, 346-47 (Tenn.1996). "The third type of delay is, by definition, justifiable and is not weighed against either party." Wood, 924 S.W.2d at 347. As stated above, the trial court found that there was no intentional delay on the part of the State. The evidence presented at the hearing bears out the trial court's finding. The trial court did conclude that the delay was caused more by negligence on the part of both the detectives who investigated the case and the State. The testimony at the hearing also supports this finding by the trial court. Detective Goodwin stated at the hearing that he referred the indictment to the fugitive

section of the police department for further action but did not follow up on bringing the defendant to trial. Ms. Omeka Warfield, of the Davidson County District Attorney's Officer also testified at the hearing. Ms. Warfield processes requests for detainers and extraditions, and she handled the defendant's case. She stated that her records state that the defendant was indicted in October 1999 and she sent a letter to the defendant at the federal facility in West Virginia. She received a certified mail receipt back, but no correspondence. She then stated that the district attorney assigned to the defendant's case decided to wait and see if the defendant would ask to be brought back. The evidence does not preponderate against the trial court's findings with regard to the cause of the delay of the prosecution of the defendant. Therefore, we agree with the trial court that the delay was caused by negligence and this weighs somewhat against the State in the balance.

(3) The Accused's Assertion of the Right to a Speedy Trial

The Tennessee and United States Supreme Courts have both recognized that "an accused who is unaware that charges are pending against him or her, as is often the case where an indictment has been sealed and not served, cannot be penalized for his or her failure to assert the speedy trial right." Wood, 924 S.W.2d at 351 n. 13 (Tenn.1996) (citing Doggett, 505 U.S. at 652-54). The defendant testified at the hearing that he hired a Mr. Ray as his attorney to pursue any State charges against him. The defendant testified that Mr. Ray found no charges. Mr. Ray was not presented as a witness at the hearing. The defendant was formally notified of the charges in January of 2001, while in a federal prison out-of-state, but decided not to assert his right to be brought to trial. The trial court's finding of fact are indeed supported by the record. The fact that the defendant had notice of the charges against him, but did not assert his speedy trial rights, accounts for 12 months out of 44 months of delay. Therefore, we find that this weighs against the State to a small degree.

(4) Prejudice

The final factor to be reviewed in determining whether a defendant's right to a speedy trial has been violated is whether the defendant has been prejudiced due to the delay. Wood, 924 S.W.2d at 348; Bishop, 493 S.W.2d at 84. This final factor is also the most important of the four balancing factors. Wood, 924 S.W.2d at 348. In determining this remaining factor, we focus on (1) any undue and oppressive incarceration, (2) the anxiety accompanying a public accusation, and (3) any impairment of the defendant's ability to prepare his defense. Bishop, 493 S.W.2d at 85; State v. Kolb, 755 S.W.2d 472, 475 (Tenn. Crim. App.1988). In applying the third of these considerations, the impairment of defense, the Tennessee Supreme Court and the United States Supreme Court have acknowledged:

> [I]mpairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown." . . . [E]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other Barker criteria, it is part of the mix of relevant facts, and its importance increases with the length of the delay.

Wood, 924 S.W.2d at 348 (citing Doggett, 505 U.S. at 655) (citations omitted).

In its findings, the trial court noted that the prejudice factor is the most important factor. The trial court stated that there was no undue or oppressive incarceration because the defendant was already incarcerated for his federal convictions throughout the delay. The trial court also stated that there was no problem concerning minimizing anxiety and concern accompanying public accusation because he had been charged and convicted for federal crimes related to the offenses under the indictment. The trial court also stated that the defendant's claim regarding his missing witnesses was "pretty nebulous" because he did not present conclusive evidence at trial that any of his former employees would actually support his case. The defendant also argued about the loss of his ability to serve his federal and state sentences concurrently. However, as the trial court pointed out, the Tennessee Supreme Court "do[es] not agree that the lost possibility of concurrent sentencing is enough in and of itself to require dismissal on speedy trial grounds." State v. Simmons, 54 S.W.3d 755, 761 (Tenn. 2001). After reviewing the record of the hearing, we find no evidence to preponderate against the trial court's findings with regard to the prejudice factor. The defendant failed to prove that he was prejudiced by the delay in the prosecution of his case.

At the conclusion of the hearing, the trial court held that after a close call, the balance tipped in favor of the State and not dismissal of the indictment. We find nothing in the record which preponderates against the findings of the trial court. After applying the Barker factors, we agree with the trial court that the balance narrowly tips in favor of the State in not dismissing the indictment. Therefore, we affirm the trial court's denial of the defendant's motion to dismiss based upon unnecessary delay.

## Motions to Suppress

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews de novo the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999).

### Admissions to Police

The defendant filed a motion to suppress statements he made to Detective Goodwin the day the police searched his residence, July 29, 1998. At trial, the State presented testimony from Detective Goodwin that the defendant acknowledged, during the search of his residence, that he had taken nude photographs of H.F. and had shown her photographs of nude children. The trial court

denied this motion. The defendant submits that the trial court erred in denying his motion to suppress his admissions to the detectives. He contends that these statements were obtained in violation of his right against self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, § 9 of the Tennessee Constitution because they were the product of custodial interrogation without the benefit of the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966).

The trial court's findings of fact with regard to the suppression of the statement to the detectives is as follows:

> As to the second issue about the statement I, again, credit the detective. I think it was clear from his testimony that the defendant was attempting to cooperate, was free to leave, even was told he was free to leave. I might even describe the defendant's attitude as kind of naively cooperating. Perhaps the defendant didn't understand how much potential trouble he was in with both the federal and state authorities and talking about how he wanted to cooperate and get back to work. If ever there was sort of a naive statement, that was it. But I think all the facts and circumstances here indicate to me that he was not in custody, that he freely spoke to the officer and it's not custodial interrogation and, therefore, it's admissible. So the motion to suppress based upon the illegality of the search and seizure is respectfully overruled. The motion to suppress the oral statement made to Officer Goodwin in the first several hours of this search on that morning is - - his presence in the home is respectfully overruled.

As this Court stated in State v. Cooper, 912 S.W.2d 756, 762 (Tenn. Crim. App. 1995):

> Whether one is in custody turns not on whether the interrogation occurred in a "coercive environment" but on whether the accused was "deprived of his freedom of action in any significant way." Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). Under California v. Beheler, 463 U.S. 1121, 1125, 1126, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983), the ultimate inquiry to determine whether a person is "in custody" for purposes of receiving Miranda protection is "simply whether there is a 'formal arrest or restraint of freedom of movement' of the degree associated with a formal arrest."

Here, the trial court specifically accredited the testimony of Detective Goodwin who testified that he told the defendant he was not under arrest and was free to leave. The court recognized that by the defendant's own testimony, he was trying to cooperate with authorities. The court noted that although the defendant may not have realized the potential for trouble, he cooperated with the detectives and said that he wanted to go back to work.

The defendant relies on State v. Anderson, 937 S.W.2d 851 (Tenn. 1996). In Anderson, our supreme court set out the test to determine whether Miranda warnings are required. The Supreme Court stated:

> [T]he appropriate inquiry . . . is whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest. The test is objective from the viewpoint of the suspect, and the unarticulated, subjective view of law enforcement officials that the individual being questioned is or is not a suspect does not bear upon the question.

Anderson, 937 S.W.2d at 855.
Anderson also includes a non-exclusive list of factors relevant to the assessment of whether Miranda warnings are required. These factors are:
1. the time and location of the interrogation;
2. the duration and character of the questioning;
3. the officer's tone of voice and general demeanor;
4. the suspect's method of transportation to the place of questioning;
5. the number of police officers present;
6. any limitation on movement or other form of restraint imposed on the suspect during the interrogation;
7. any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses;
8. the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt; and
9. the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Id. at 855.

Because this was a motion to suppress, we must accredit the trial court's findings of fact. The trial court accredited the testimony of Detective Goodwin, and the evidence in the record does not preponderate otherwise. When we apply the Anderson factors to the facts as testified to by Detective Goodwin, we determine that the defendant was not in custody under the totality of the circumstances.

The defendant was questioned at his residence in the middle of the day. He signed the consent to search form within minutes of returning home, so the time prior to his consent to search was negligible. From the testimony of the defendant, the officers tone of voice and general demeanor seemed to be businesslike, but not abusive. The defendant drove himself to the residence in his girlfriend's car. It appears that although there were several law enforcement officers from several different agencies, the defendant was not restrained. The interactions between the officers and the defendant appeared to be cooperative and cordial. According to Detective Goodwin, he told

the defendant he wanted to speak with him and the defendant sat down. Detective Goodwin also stated that he told the defendant he was free to leave if he wanted and he was not under arrest.

Under these factors and the test in <u>Anderson</u>, we do not find the defendant to be in custody as required by <u>Miranda</u>. The defendant was at his own residence and had access to both his car and his girlfriend's car. He was told he was free to leave. Detective Goodwin also told the defendant he was not under arrest. Under the totality of the circumstances, we conclude a reasonable person would not consider himself to be under formal arrest. Therefore, we affirm the trial court's denial of the defendant's motion to suppress.

<u>Handgun</u>

The defendant also argues that the trial court erred in denying his motion to suppress with regard to the introduction of the defendant's handgun. The trial court's findings of fact with regard to the suppression of the handgun is as follows:

> As to the weapon, I accredit Mr. Goodwin's testimony that the defendant consented to that search. It may be a little odd that once having it he then has some doubts about its identity and, therefore, left it at the house. Because I believe at that time he could have seized it as evidence. It speaks well for him how he wanted to be assured that it was the weapon under consideration. I think he also could have seized it just because as probable cause of a misdemeanor of carrying a weapon for purposes of going armed. But he didn't so, he left it there. Ms. Mayes testified about the phone call, his permission to come back and get it, which I think was constitutionally valid. And the original seizure was constitutionally valid.
>
> There's an interesting case decided by the Court of Criminal Appeals in the seventies or maybe early eighties. I happen to know it, because it comes from this court, although on a prior judge. It's called State versus Duer (phonetic) or Duer versus the State. And what it talks about is the officer's opinion about whether or not he had probable cause or the legality of his action is really not relevant. A judge has to determine whether the facts were sufficient for probable cause or nonprobable cause, not what the officer thinks of his own actions. So that just buttresses the idea that while the officer may have had second thoughts about seizing this, I believe his initial seizure was constitutional.

The trial court clearly accredits the testimony of Detective Goodwin. We are bound by the trial court's findings of fact when the evidence does not preponderate against them. In his testimony, Detective Goodwin stated that the defendant consented to the search of his truck, where Detective Goodwin found the gun. The defendant himself admitted at the hearing that he accompanied the detectives to the truck and told them about the gun. The evidence does not preponderate against the trial court's findings of fact. Therefore, we conclude the defendant consented to the search and the trial court properly denied the defendant's motion to suppress.

## Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

Especially aggravated sexual exploitation of a minor is found at Tennessee Code Annotated section 39-17-1005. This statute states that "[i]t is unlawful for a person to knowingly promote, employ, use, assist, transport or permit a minor to participate in the performance or in the production of material which includes the minor engaging in: (1) sexual activity . . . ." The definition of "sexual activity" under this part of the code includes, "(G) [l]ascivious exhibition of the female breast or the genitals or the pubic area of any person." False imprisonment is addressed at Tennessee Code Annotated section 39-13-302. This section states, "[a] person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere with the other's liberty."

The following facts were presented at trial. At the time of trial, H.F. was eighteen years old. H.F. testified that the defendant caught her shoplifting at a Revco pharmacy where he was an assistant manager on December 5, 1997. In exchange for the defendant not pressing charges, H.F. agreed to come by the store once or twice a week to speak with the defendant to assure him that she was staying out of trouble. Barbara Bone of the Metro Police Youth Services Division explained that the defendant called about dismissing the citation. She described that decision as uncommon. H.F.'s mother explained that the defendant thought he and the victim could work out some agreement to drop the charges. Although unable to give an exact number, H.F. visited the store several times to check in with the defendant. H.F.'s mother made sure that H.F. honored her agreement with the defendant.

Sometime after January 1, 1998, H.F. made a stop at the store to check-in with The defendant. He called her over to his car and showed her pornographic pictures of young children that

the defendant said he got off of the internet. He also said that he was in one of the photos. The defendant told H.F. that the girls made a lot of money for appearing in the photos. When H.F. got home, she told her mom that the defendant was a pervert.

H.F. stopped by the store, after the "picture incident," on a Sunday evening shortly before closing. The defendant told H.F. to follow him to the back of the store. When they entered the manager's office, the defendant locked the door behind H.F. The defendant asked H.F. whether she had ever had sex with an older man. The defendant told H.F. that he had had sex with a fifteen-year-old girl. The defendant continued to make sexual comments and started rubbing H.F.'s legs. When H.F. tried to leave, he told her to sit down. At that time, a gun appeared on the desk. The defendant told H.F. she would not be able to leave until some photos were taken.

After H.F. removed her jacket, shirt and pants, the defendant took a polaroid photo of H.F. in her bra and panties. He then told her to remove her undergarments. He offered her blue and pink pills, which H.F. refused. Fearful for her life, H.F. removed the rest of her clothing. The defendant then took a photo of her sitting in the chair with her feet on the chair base, exposing her genitals and breasts to the camera. The defendant put the photos in his pocket. He also took a photo of the victim's face.

After the defendant allowed H.F. to get dressed, H.F. begged for the photos, but the defendant refused. He later pulled a gun from under the seat of his truck, placed three bullets in the chamber, and told her he would kill her and nobody would know who did it. The defendant also threatened to prosecute H.F. for shoplifting if she told anyone about the photos.

When H.F. got home, she did not tell her mother what happened because she was scared. H.F. never went back to the pharmacy. She later told her mother about the incident during her hospitalization at Vanderbilt Psychiatric Hospital. While at Vanderbilt, H.F. spoke with the police. H.F. later identified the gun at the district attorney's office.

Detective Jeffrey Goodwin of the Metro Police Department used to work with the Youth Services division investigating child sex crimes. By the time he became involved in this investigation, the defendant was no longer working at the pharmacy. When Detective Goodwin first spoke with the victim, she was crying and nervous. However, when she gave the detective the clothing she was wearing on the day of the crime, she was cooperative and helpful.

As part of his investigation, Detective Goodwin went to the defendant's home in LaVergne. He initially followed Brandy Mayes from the home to the Hickory Hollow Mall. Mayes owned the home in question, but shared it with the defendant, who was her live-in boyfriend. Mayes gave written consent to search the home. When the defendant arrived home, he spoke with the detective.

At first, the defendant did not recognize H.F.'s name. However, when asked if he recalled a female juvenile involved with a shoplifting citation at the pharmacy where he had previously worked, he remembered H.F.. At that time, the defendant admitted showing child pornography to

her. He said the girls in the photos, taken off of the internet, were "not in action." The defendant also acknowledged that during one of H.F.'s visits to the store, he took her to his office and then made five or six nude photographs of her. The defendant said he gave the photos to a maintenance man at the pharmacy and to a friend of his in Arkansas. At the time of the trial, the detective had not recovered any of the pictures.

The defendant claimed he might have one or two of the photos in his truck. During the search of the truck, Detective Goodwin found polaroid photos of various store displays. He also found a handgun tucked in the seat of the truck.

At the time of trial, Patrick Kennedy work as a store manager at a CVS drugstore, formerly Revco. According to Kennedy, store policy is to call the parents if a young person is caught shoplifting. However, he testified that it was not Revco's policy to have minors report to store managers to make sure they remained out of trouble. In 1998, he worked at the Revco location in Donelson where the defendant worked. To the best of Kennedy's recollection, a locked door in the office could be opened by turning the handle from the inside.

The jury obviously credited the testimony of H.F. as to whether the defendant made a photograph of her, and therefore, was guilty of especially aggravated sexual exploitation of a minor. H.F. testified that when the defendant locked her in the manager's office he forced her to take her clothes off and made a photograph of her displaying her breasts and her genitals. Although the photographs were never found, it is the jury's province to judge the credibility of witnesses. We are not to second-guess the jury on credibility issues. Therefore, we conclude there is sufficient evidence to find the defendant guilty of especially aggravated exploitation of a minor.

The jury also found H.F.'s testimony to be credible so as to prove false imprisonment. H.F. testified that the defendant locked her in the manager's office. This falls within the definition of false imprisonment. As stated above, it is the jury's province to judge the credibility of witnesses. The indictment was originally for especially aggravated kidnapping, which requires the additional use of a deadly weapon. The jury's decision to convict the defendant of the lesser-included offense shows that the jury was weighing the evidence very carefully.

When viewed in a light most favorable to the State, we find that there is ample evidence to support the jury's finding of guilt for especially aggravated exploitation of a minor and false imprisonment.

### Hearsay Testimony

The defendant next argues that the trial court erred in admitting hearsay testimony. At trial the following exchange occurred:

| [State]: | When you saw those pictures, what did you do that day? |
| [H.F.]: | I went home and told my mom that I think this guy is a pervert. |

| | |
|---|---|
| [State]: | Did you tell her why you thought he was a pervert? |
| [H.F.]: | No. I was scared. |
| [State]: | Did your mom respond to what you said? |
| [H.F.] | She asked me why and I wouldn't tell her. |
| [Defendant]: | Objection, Your Honor. Hearsay. |
| [State]: | It's not offered for the truth. |
| [Court]: | Well approach the bench, please. |

BENCH CONFERENCE

[State]:  [H.F.], I'm going to rephrase the question and approach it in a different way.

You said you didn't tell your mom why you thought that [the defendant] was a pervert in your mind, is that correct?

| | |
|---|---|
| [H.F.]: | Yes. |
| [State]: | So, did you tell your mother that he had shown you these types of pictures? |
| [H.F.]: | No, sir. |
| [State]: | When you told your mother that you thought he was a pervert, what was your mother's response to your [sic]? |
| [H.F.]: | She said oh [H.F.]. She didn't believe that he was a pervert |
| [State]: | So, did you mother tell you not to go back to the store at that point in time? |
| [H.F.]: | No. |
| [State]: | Did she tell you stay away from there? |
| [H.F.]: | No. |

The defendant's objection came after H.F. testified, "She [H.F.'s mother] asked me why and I wouldn't tell her." The defendant objected to this statement. A bench conference was then had, that is not transcribed in the record. Following the bench conference, the State elicits the statement in question as testified to by H.F., "She said oh [H.F.]. She didn't believe that he was a pervert."

As noted above, the bench conference conducted in the trial court has not been transcribed in the record. The bench conference is imperative to review of this issue. Without the transcription of the bench conference, this Court does not have the arguments by both sides as to what the actual objectionable hearsay statement was and what the trial court considered in making its decision. Because it appears to the Court that the record on appeal is not adequate to facilitate review, the defendant has waived this issue. See Tenn. R. App. P. 24(b) ("[T]he appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the basis of appeal."). In addition, when a record is not complete and does not contain relevant information, this Court must presume that the trial court was correct in its ruling. See State v. Richardson, 875 S .W.2d 671, 674 (Tenn. Crim. App.1993); State v. Cooper, 736 S.W.2d 125, 131 (Tenn. Crim. App.1987). Moreover, it is difficult to understand how the statement that H.F.'s mother did not believe that the defendant

was a pervert could have prejudiced the defendant since it calls into question H.F.'s opinion of the defendant.

Therefore, we affirm the trial court's decision that the statement was not hearsay presented for the truth of the matter asserted.


### Evidence of Other Sexual Offenses Involving the Victim

The defendant next argues that the trial court erred in admitting evidence that another person had been convicted of a sexual offense involving the alleged victim in an unrelated case. At trial, the defendant asked the victim whether she had stolen her grandmother's car. The State objected to this question. A jury-out hearing followed, and the defendant claimed that the issue of whether H.F. stole her grandmother's car was relevant because it impacted the victim's credibility. The trial court also ruled at the same jury-out hearing that the defendant could ask H.F. about other stresses going on in her life that led to her psychiatric hospitalization at Vanderbilt. The defense questioned H.F. about the theft of her grandmother's car and other stresses to prove that her hospitalization was not solely related to the crime in question.

On redirect examination, H.F. testified about a sexual assault against her on the night of the tornado, which occurred after the incidents with the defendant. She stated that Detective Goodwin also investigated the sexual assault that occurred on the night of the tornado. The defendant did not object to this testimony. On re-cross, H.F. testified that the perpetrator was not the defendant.

During direct examination of Detective Goodwin, the trial court allowed an offer of proof out of the hearing of the jury. The State proposed asking Detective Goodwin about the sexual assault assertions made by the victim against the third party. After much discussion, the defendant objected on both relevance and hearsay grounds. The trial court overruled the objection on the relevance grounds and stated:

> I – I reject the defense's view that it's not relevant, and here's why I think it's relevant: I think when you throw out, in a case like this, the fact that somebody else – that – that she's been a subject of another – sexual assault, there's always some possible implication that she could be a person who makes false allegations.
> Therefore, I think it's fair game for the State to show that there was substance to this, so the jury is not left with the implications that it was false.

The trial court did sustain the hearsay objection concerning admissions by the third party that he perpetrated the sexual assault. On re-direct examination, the State attempted to introduce Detective Goodwin's testimony concerning his investigation of the sexual assault as well as a certified copy of the third party's conviction for the sexual assault. The defendant objected based upon improper redirect examination. During a bench conference, the trial court told the defendant that he would

sustain his objection, but that the State could call a deputy clerk to testify and enter the certified copy into evidence. At this point, the defendant withdrew his objection and told the State to go ahead and ask Detective Goodwin about the certified copy.

The defendant now argues that this evidence should not have been admissible because the evidence was irrelevant under Rules 401 and 402 of the Tennessee Rules of Evidence, that it allowed the State to improperly bolster the credibility of its own witness, and that it created undue sympathy for H.F.

Evidence must be relevant and probative to an issue at trial in order to be admissible. State v. McCary, 922 S.W.2d 511, 515 (Tenn. 1996); see also Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence may be excluded at trial if the probative value of that evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Tenn. R. Evid. 403. The determination of relevancy is left to the discretion of the trial court, and this Court will not overturn a trial court's determination in this regard in the absence of an abuse of discretion. State v. Williamson, 919 S.W.2d 69, 78-79 (Tenn. Crim. App. 1995); State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

The defendant asked H.F. about her psychiatric hospitalization and the theft of her grandmother's car which led to her detention at the Juvenile Detention Center. In the jury-out hearing, the defendant's attorney stated that they wanted to bring out the reasons H.F. ended up in the hospital and that she was under many stresses. The fact that H.F. was sexually assaulted by a third party shortly after her encounter with the defendant, but before her hospitalization, is without question an additional stressor that did most likely contribute to her hospitalization. The defendant made this information relevant when he questioned H.F. about her hospitalization. This evidence is not prejudicial to the defendant. It gives yet another reason other than any dealings with the defendant for H.F.'s hospitalization.

We do not find any abuse of discretion in the decision of the trial court. Therefore, we affirm the trial court's decision.

### Failure to Declare a Mistrial

The defendant also claims that the trial court erred by failing to declare a mistrial when the prosecutor, in direct violation of the trial court's pretrial ruling, elicited testimony from a police detective that the defendant admitted to having child pornography on his home computer. Prior to trial the defendant filed a motion in limine to exclude any and all evidence related to the contents of the defendant's home computer. The trial court granted this motion.

During the direct examination of Detective Goodwin, the State asked him about the search of the defendant's residence. Detective Goodwin testified about his discussion with the defendant when the defendant arrived home. The following exchange occurred during the direct examination:

[State]:        What did you ask [the defendant]?
[Witness]:     I started out asking him about child pornography pictures, and he acknowledged that he did have child pornography pictures and that he did have some on his computer.
                And I asked him about a – a work computer or home computer. He said he didn't have any at work, his private collection was all at home.
[Court]:        Hold on. Excuse me.
                Approach the bench please.

A bench conference was held out of the hearing of the jury. The defendant immediately objected and there was a discussion concerning the actual parameters of the trial court's prior ruling. The trial court then held a jury-out hearing. During this hearing, the trial court made clear its ruling that there was to be no mention of the child pornography contained in the defendant's computer. The State continued with its direct examination of Detective Goodwin. The defendant did not ask for a mistrial or a curative instruction. In State v. Jones, 733 S.W.2d 517 (Tenn. Crim. App. 1987), this court stated:

> The decision whether to grant a mistrial is within the discretion of the trial court whose decision will not be disturbed on appeal unless there was an abuse of that discretion. State v. Hall, 667 S.W.2d 507, 510 (Tenn. Cr. App. 1983). Generally, a mistrial will be declared and the jury discharged in a criminal case only if there is "manifest necessity" requiring such action by the trial judge. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Cr. App. 1977).
>
> . . . .
> The appellant has the responsibility to present to the appellate courts a transcript of "such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Rule 24(b), T.R.A.P. In that regard, counsel must insure that objections are not made at side-bar conferences or insist that the court reporter record such conferences verbatim. Furthermore, counsel must not fail to take "whatever action was reasonably available to prevent or nullify the harmful effect of an error." Rule 36(a), T.R.A.P.

733 S.W.2d at 522.

The defendant also points to another piece of testimony where the following exchange occurred:

> [State]:        And he admitted showing her photographs, or on this colored copy of notebook paper as you described, of children that are nude; is that correct?
>
> [Witness]:    That's correct.
>
> [State]:        And this all took place at his residence, correct?
>
> [Witness]:    The interview took place at this residence. The actual showing of this in the photograph, it took place in the Revco Drugstore in Donelson.
>
> [State]:        And he acknowledged to you that he knew that having child pornography was – was wrong, right?
>
> [Witness]:    That's correct.

The defendant specifically points to the portions that are highlighted above.  The defendant did not object to this testimony at trial, and once again, did not ask for a curative instruction or a mistrial.  However, this testimony does not refer to defendant's computer at all, but rather to photographs that he showed H.F.  It is our understanding that the order limiting reference to photographs from the defendant's computer does not prohibit testimony concerning the photographs actually shown to H.F.  At the hearing on the motion in limine, the defense attorney specifically stated that the defense was only trying to exclude evidence concerning the contents of the defendant's computer.

Failure to contemporaneously object, request curative instruction or move for mistrial is typically grounds for waiver of an issue on appeal, absent plain error.  See State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995); State v. Robinson, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997); State v. Griffis, 964 S.W.2d 577, 599 (Tenn. Crim. App.1977); State v. Seay, 945 S.W.2d 755, 762 (Tenn. Crim. App. 1996); Tenn. R. App. P. 36(a); Tenn. R. Crim. P. 52(b).

In order to review an issue under the plain error doctrine, five factors must be present: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.  State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (citing State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)); see also Tenn. R. Crim. P. 52(b).

For a "substantial right" of the accused to have been affected, the error must have prejudiced the defendant.  In other words, it must have affected the outcome of the trial court proceedings.  United States v. Olano, 507 U.S. 725, 732-37 (1993) (analyzing the substantially similar Fed. R. Crim. P. 52(b)); Adkisson, 899 S.W.2d at 642.  This is the same type of inquiry as the harmless error analysis under Tenn. R. App. P. 36(b), but the appellant bears the burden of persuasion with respect to plain error claims.  Olano, 507 U.S. at 732-37.

In his brief, the defendant lays the burden on the trial court to give a curative instruction or declare a mistrial without the defendant having requested such remedies.  Therefore, he does not

argue, as such, this issue as plain error. However, he does make an argument concerning the prejudicial nature of the testimony in question.

The defendant argues that the evidence of his guilt is "close" and, therefore, the prejudicial impact of the statement is even greater. He also states that the statement is prejudicial because it is evidence of another conviction. However, we view the statement differently. Initially we point out that Detective Goodwin stated that the defendant admitted he had child pornography pictures on his computer. There was no reference as to the number of pictures. In actuality, as stated in other portions of the record not presented to the jury, the number of pictures was very, very high and would definitely be prejudicial. However, the jury did not know how many pictures there actually were on the defendant's computer. In addition, the federal conviction for the possession of the pictures on the defendant's computer was not mentioned in front of the jury. And finally, the jury already knew that the defendant was in possession of pornographic images of children because H.F. testified that the defendant had shown her pornographic images of children before he took the photographs of her. Therefore, the defendant has not carried his burden of proving prejudice so that it would affect the outcome of the trial.

Therefore, we affirm the trial court's actions with regard to Detective Goodwin's testimony.

### Sentencing

The defendant also appeals his sentence imposed by the trial court. At the conclusion of the sentencing hearing, the trial court sentenced the defendant to eleven years on his conviction for especially aggravated sexual exploitation of a minor and eleven months, twenty-nine days on his conviction for false imprisonment. He was sentenced as a Range I Standard Offender. The trial court further ordered that his sentences be served concurrently to each other, but consecutively to the federal sentence that he is currently serving.

The defendant argues that his sentence for especially aggravated sexual exploitation of a minor is excessive and that his state sentences should not be run consecutively to his federal sentences.

"When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b);

Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169.

In balancing these concerns, a trial court should start at the presumptive sentence, enhance the sentence within the range for existing enhancement factors, and then reduce the sentence within the range for existing mitigating factors. Tenn. Code Ann. § 40-35-210(e). No particular weight for each factor is prescribed by the statute. See State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App. 1995). The weight given to each factor is left to the discretion of the trial court as long as it comports with the sentencing principles and purposes of our code and as long as its findings are supported by the record. Id.

The trial court properly followed the procedure for imposing a sentence. The trial judge applied the enhancing factors then the mitigating factors and concluded that the defendant should be sentenced to eleven years. Especially aggravated sexual exploitation of a minor is a Class B Felony which has a sentencing range of not less than eight nor more than twelve years. The trial court's sentence of eleven years is one year short of the maximum sentence. The trial court relied upon three enhancement factors: (1) "The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range." Tenn. Code Ann. § 40-35-114(2); (2) "The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement." Tenn. Code Ann. § 40-35-114(8); (3) "The defendant abused a position of public or private trust . . . ." Tenn. Code Ann. § 40-35-114(16).

Length of Sentence

Because the trial court followed the sentencing principles, we must now decide whether these enhancement factors are supported by the record. For the first enhancement factor, a previous history of criminal conduct or criminal behavior, there is ample support. The defendant was serving a federal sentence at the time of his trial and sentencing. The second enhancement factor, the offense was committed to gratify the defendant's desire for pleasure or excitement is also supported. The trial court stated:

> I think this offense the main offense here, could be committed in a totally, kind of, sterile commercial setting in which that wouldn't be the case. But that's not the case here. There was testimony, which I credit, that the defendant mentioned to her about having sexual relations and the like, so it was obvious that the taking of the photographs were for his pleasure and excitement, as well as a potential, either gratuitous or commercial exploitation with the photograph.

In State v. Arnett, 49 S.W.3d 250, 262 (Tenn. 2001), the Tennessee Supreme Court stated that the State must "provide additional objective evidence of the defendant's motivation to seek pleasure or excitement" when applying this enhancement factor which can include "sexually explicit remarks and overt sexual displays made by the defendant, such as fondling or kissing a victim or otherwise behaving in a sexual manner . . . ." H.F. testified to an incident where the defendant showed her

-21-

pornographic photographs of young children and even told her that he was in one of the photographs. According to H.F., the defendant also asked H.F. if she had ever had sexual relations with an older man and bragged that he had had sexual relations with a fifteen-year-old girl. The defendant also made several sexual comments to H.F. while rubbing her legs and even offered her some pills to help her relax. This testimony clearly meets the requirements set out in Arnett. Therefore, the record supports the trial court's application of this factor.

The third factor, the defendant was in a position of public or private trust is also supported by the record. The trial court stated, "that the defendant abused a position of private trust when he manipulated this situation to become, sort of, a defacto probation officer . . . 'Well, I won't bring formal charges but you report to me,' then he took that position and exploited it as the proof in the case shows." The defendant relies upon State v. Kissinger, 922 S.W.2d 482 (Tenn. 1996), to support his position that this enhancement factor does not apply. In Kissinger, our supreme court stated, "The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith." Kissinger, 922 S.W.2d at 488. The trial court's characterization of the relationship is appropriate. The defendant put himself in the position of private trust when he spoke with H.F. and her mother and promised not to press charges if H.F. would come and do work for him at the pharmacy. He had H.F. periodically check in with him ostensibly for the purpose of making sure she was staying out of trouble. He put himself in the position of a person who takes an interest in the mentoring or rehabilitation of a child. We find that the record supports the trial court's application of this enhancement factor.

As stated above, it is in the trial court's discretion as to the weight of each factor. Having found support for the application of each enhancement factor, we affirm the trial court's sentence of eleven years for especially aggravated sexual exploitation of a minor.

Consecutive Sentencing

At the sentencing hearing, the trial court made the following findings with regard to consecutive sentencing:

> I believe that consecutive sentencing is warranted here. I think this defendant has been convicted, if I look at the prior Federal convictions and this conviction here of two more offenses involving sexual abuse of a minor. And, I think there is proof here that the victim received mental damage from this offense. And I hold that this child pornography offenses, whether they be Federal or State involve sexual abuse of a minor, and the intent of both the Congress of the United States and the Tennessee Legislature in passing these laws was to stop sexual abuse of a minor. And I, therefore, find that 40-35-115(5) [sic] is present and that this eleven year sentence should run consecutive to the Federal convictions.

-22-

The record reflects that the defendant was convicted in federal court for possession of material involving sexual exploitation of minors and receipt of material involving sexual exploitation of minors. Each of these sentences were for 51 months with three years supervision. Clearly this fact supports the trial court's application of Tennessee Code Annotated section 40-35-115(b)(5) that the defendant has been convicted of two or more offenses involving the sexual abuse of a minor. In addition, Rule 32(c) of the Tennessee Rules of Criminal Procedure states, "[i]f the defendant has additional sentences or portions thereof to serve, as the result of a conviction . . . in federal court, the sentence imposed shall be consecutive thereto unless the court shall determine in the exercise of its discretion that good cause exists to run the sentences concurrently . . . ." We find no abuse of discretion in the trial court's imposition of consecutive sentences. The evidence does not preponderate against the trial court's findings. Therefore, we affirm the defendant's sentence.

## CONCLUSION

For the above reasons, we affirm the decision of the trial court.

_____
JERRY L. SMITH, JUDGE